In re POWER SWING PARTNERS, dba Power Swing, a California Limited Partnership, Debtor.

Bryan J. GRUNEWALD, Plaintiff,

v.

POWER SWING PARTNERS, Defendant.

POWER SWING PARTNERS, Defendant and Third Party Plaintiff,

v.

Bryan J. GRUNEWALD; Grunewald Enterprises; Sunland Marketing, Inc., a California Corporation; Nancy J. Freitas, Third Party Defendants.

Bankruptcy Nos. C80–0022–M, 80–00084–M.

United States Bankruptcy Court, S. D. California.

July 30, 1980.

Everett G. Barry, Jr., of Freshman, Mulvaney, Marantz, Comsky, Forst, Kahan & Deutsch, San Diego, Cal., for debtor.

David R. Thompson of Thompson, Crawford & Kellers, San Diego, Cal., for Grunewald, Grunewald Enterprises and Freitas.

Ludlow S. Butler, Jr., San Diego, Cal., for Sunland Marketing.

## MEMORANDUM OPINION REGARDING PATENT VALIDITY, INFRINGEMENT AND UNFAIR COMPETITION

JAMES W. MEYERS, Bankruptcy Judge.

### I

On January 17, 1980, the debtor, Power Swing Partners, filed for protection under Chapter 11 of the United States Bankruptcy Code. On February 4, 1980, the plaintiff, Mr. Bryan J. Grunewald, filed a com-

plaint naming the debtor as defendant and seeking an accounting, injunctive relief and an award of damages. The complaint asserted claims of breach of a license agreement, trademark infringement and unfair competition.[1] On March 10, 1980, the debtor answered the complaint and filed a counterclaim against Mr. Grunewald and a third party complaint naming Grunewald Enterprises, Sunland Marketing, Inc., and Ms. Nancy J. Freitas as third party defendants. This counterclaim and third party complaint charged patent and trademark infringement, unfair competition, conspiracy and sought injunctive and declaratory relief. A trial was commenced before this Court on May 12, 1980, with final arguments being heard on June 20, 1980. This opinion is filed to announce this Court's decision on the issues presented.

## II

## FACTS

### A. *The Development and Patenting of the Exerciser*

When Mr. Grunewald was ten years old he was a Little League baseball player and canoeing enthusiast. While on a canoeing trip in his native Minnesota he conceived of the concept of swinging a canoe paddle in order to help maintain his baseball batting skills. He could see that the air resistance to the swinging paddle could build up the muscles used by a baseball batter. However, he noted that the paddle had serious drawbacks in that it provided too large a mass, and it tended to lose air resistance as it was rotated in the normal baseball swinging motion. He determined to improve upon this concept, but continued to privately use the canoe paddle from time to time even while playing baseball at Penn. State University.

After Mr. Grunewald left college he was inactive in the baseball field until he moved to San Diego in 1968. After several seasons play in semiprofessional baseball he decided, in 1971, to fulfill his boyhood dream of perfecting his air resistance exerciser. Working alone for three weeks in a garage behind a friend's house he constructed a prototype device, which he named the "Power Swing".[2]

Mr. Grunewald showed his creation to several friends in the early summer of 1971, and shortly thereafter he commenced the patent application process. On August 19, 1971, a firm called the Washington Patent Office Search Bureau caused his first patent application to be filed with the Patent and Trademark Office ("PTO"). This application was rejected, causing Mr. Grunewald to employ patent attorney Neil F. Martin to assist him in securing a patent. Mr. Martin caused a supplemental application to be filed on April 3, 1972, which resulted in patent No. 3,809,397 being issued on the Power Swing, by the PTO on May 7, 1974.

### B. *Marketing Efforts and Licensing*

In the meantime Mr. Grunewald contracted with Leach Industries in February of 1972, for the production of 1,500 plastic units for use on baseball bats. Later, in 1973, he contacted advertising man Donald C. Wilson, who aided him in producing a nationwide advertising mailing. This effort failed due to the limited financial resources available to the inventor. He entered into several marketing arrangements over the next several years which were all unsuccessful. However, Grunewald was able to develop several adaptations of his device for use in golf and racquetball.

On April 27, 1977, Mr. Grunewald and Grunewald Enterprises[3] granted an exclusive license to manufacture and sell Power Swing exercisers in the United States, Ja-

---

1. An additional charge of patent infringement was later withdrawn by the plaintiff.

2. This mark was never registered with the United States Patent and Trademark Office, or with the State of California.

3. While Mr. Grunewald signed for Grunewald Enterprises as a partnership, it was in fact only a distribution arrangement between Mr. Grunewald and some of his associates. Mr. Grunewald personally held all rights to the Power Swing patent.

pan and Canada to Mr. Michael R. Krupp. This written licensing agreement provided for a complex royalty calculation formula with minimum annul royalties starting on August 1, 1977, as follows:

| YEAR | MINIMUM ROYALTY DUE |
|------|---------------------|
| 1st | $12,500 |
| 2nd | 20,000 |
| 3rd | 37,500 |
| 4th | 50,000 |
| 5th | 62,500 |
| 6th and remaining | 75,000 |

In addition, the agreement provided for the possibility that the patent might be declared invalid. If invalidity were found, then no minimum royalties would be due and the licensee would only be required to pay a $.25 royalty per unit sold for use of any trademark rights.

The agreement further provided that the licensee must be given sixty (60) days advance written notice of any intent to terminate because of any default by the licensee. The licensee was then granted sixty (60) days to cure any default and the licensee had the right to immediately demand that the matter be submitted to arbitration if he disagreed with the allegations of default.

### C. *The Debtor as Licensee*

Mr. Krupp assigned his rights under the licensing agreement to the debtor. This partnership raised over $400,000 in capital contributions and a bank loan and devoted it all towards developing and marketing the Power Swing line of exercise devices. In 1978, Mr. Stephen A. Stephenson became the debtor's general partner. He had been assisting Mr. Krupp since the exclusive license was granted.

The first four quarterly payments on the minimum royalties were made on a timely basis. Thereafter, the minimum royalty payments were not paid on time. This caused Mr. Grunewald to become concerned and on January 12, 1979, he wrote to the debtor indicating his displeasure. On February 15, 1979, Mr. Grunewald, for himself and Grunewald Enterprises, entered into an amendment of the exclusive licensing agreement with the debtor. This amendment recognized Mr. Krupp's assignment of his rights to the debtor. Additionally, Mr. Grunewald forgave $7,000 of the overdue minimum royalties required under the agreement.

Difficulties continued between the parties resulting in Mr. Grunewald sending a written termination notice to the debtor on March 15, 1979. Mr. Grunewald gave written notice of the withdrawal of the termination notice when the debtor paid him $1,000 in cash and provided him with a promissory note for another $3,000, all representing payments on accrued royalties.

Mr. Grunewald was continually concerned that the debtor was not pursuing an adequate promotional and marketing program. On many occasions he met with Mr. Stephenson or Mr. John Grandona, who became the debtor's General Manager in April of 1979. These meetings concerned themselves with discussions, occasionally acrimonious, on improving marketing efforts and the payment of back royalties. These continuing problems resulted in Mr. Grunewald becoming increasingly frustrated and irritated.

While Mr. Grunewald was still hopeful that the various problems could be resolved, he delivered another written termination notice on June 11, 1979, at which time $6,000 in royalty payments were overdue. In this letter he referred to the delinquent royalty payments and requested that the debtor prepare a plan outlining proposed changes placing the debtor on a firm financial basis. This termination notice was greeted with consternation by the debtor. It was followed up by several notes from Mr. Grunewald wherein he listed several actions he insisted be accomplished, including an adequate guarantee of his royalty payments.

Mr. Stephenson was hopeful that the debtor could again satisfy Mr. Grunewald's demands and appointed a "task force" to create a viable plan for submission to the Grunewald interests. On his part, while frustrated with the debtor, Mr. Grunewald

was hopeful that the problems could be solved and funds raised to pay the royalties on a regular basis, as he did not want to start on yet another new distribution arrangement. The parties again had a number of discussions concerning their problems and various alternatives were suggested, including higher royalties being assessed on foreign sales. Stephenson and Grunewald conferred on the overdue royalty payments with the latter suggesting that the partners sell some of their personal assets to pay the back royalties. Stephenson remained hopeful that a further extension of time would be granted.

The negotiations culminated in a meeting on July 11, 1979, at the debtor's headquarters between Mr. Grunewald, along with his associate Mr. Wilson and the principal managers of the debtor, and several of the debtor's limited partners. They discussed methods to be employed to increase sales volume and to raise the funds for the royalties due. Mr. Grunewald indicated he expected to be paid $15,000 before the termination deadline and Mr. Stephenson assured him that he would be paid. Mr. Grunewald was noncommittal regarding the debtor's proposals and gave no indication that he would extend the termination deadline.

The limited partners made it clear that while they would invest more funds for a further marketing effort, they would not put up cash to cover back royalty obligations. Also, the debtor's business continued to deteriorate with the firm being besieged by unpaid suppliers and creditors. Mr. Grunewald kept up the pressure for payment of the accrued royalties. On August 10, 1979, the termination deadline, in a desperate move, Mr. Stephenson caused a check for $15,000 to be drawn in favor of Grunewald Enterprises even though he knew the funds in the account were not sufficient to cover it.[4] When the check was ready for mailing it was pointed out to Stephenson that it had not been signed. He cavalierly replied,

"Bryan will be back", and directed that the unsigned check be posted along with a handwritten note he had prepared. In the note Mr. Stephenson, for the first time, questioned the amount of the back royalties due and charged Mr. Grunewald with disrupting the debtor's office and interfering with its employees. Grunewald was also requested to come to the debtor's office to sign releases regarding the termination notice.

Mr. Grunewald went to the debtor's office to have the check signed and was told by Stephenson that his failure to sign was simply an "oversight".[5] The check was later presented for payment but was not honored given the debtor's lack of funds.

Even after the royalty check was dishonored, Mr. Grunewald continued to discuss the situation with the responsible officers of the debtor. When it became clear that the debtor could not fulfill even the minimal requests made by Mr. Grunewald, then he negotiated a new marketing arrangement with a new entity, Sunland. Under the direction of Mr. Wilson as President, this California corporation formed in late September, 1979, has devoted itself entirely to manufacturing and marketing Power Swing devices as the exclusive licensee of Grunewald Enterprises.

On October 8, 1979, Mr. Grunewald wrote to the debtor notifying them of his arrangement with Sunland and accusing them of illegally continuing to manufacture and market the Power Swing devices. The debtor continues to market Power Swing devices and uses a registered trademark symbol on all units it distributes. However, sales have dramatically declined due to lack of product and the competition from Sunland.

### D. *Mr. Grunewald's Dealings with the Debtor's Employees*

Despairing of any chance of the debtor's fortunes improving, Mr. Grunewald com-

---

4. $15,000 was the amount demanded by Mr. Grunewald even though the exact amount of accrued royalties due on August 1, 1979, was $15,375.

5. This Court does not find credible the testimony that Mr. Stephenson advised Mr. Grunewald that the check should be held for a few days as it would not then clear due to insufficient funds.

menced to cast around for some alternate arrangement to market his invention and start the royalty payments flowing again. In early summer of 1979, he approached Mr. Grandona, the debtor's General Manager, and they discussed establishing a new marketing company if the debtor should fail. They sounded out a local bank for financial support, but nothing was agreed upon. In this same vein Mr. Grunewald made some projections regarding a new company and discussed them with at least one of the debtor's limited partners. These discussions were all in anticipation of the debtor concluding operations. At all times prior to August 11, 1979, Mr. Grunewald was anxious for the debtor to succeed so that he could receive the back royalties.

Mr. Grunewald also formed a strong relationship with Ms. Nancy Freitas, who had been with the debtor since February, 1978, eventually becoming the Director of Marketing. She kept Mr. Grunewald informed of the lack of promotional activity and the low morale among the sales force. This lack of sales activity declined further after April of 1979, as the debtor had stopped making commission payments to the sales representatives. When Ms. Freitas told Mr. Grunewald how discouraged she had become, he encouraged her to remain on the job because he recognized that her abilities were vital to the debtor's sales efforts. He never asked her to terminate her employment with the debtor.

Ms. Freitas remained with the debtor even after Mr. Grunewald terminated the license agreement. However, when Sunland came into existence she accepted the position of Sales Director with that firm on October 5, 1979, after terminating her employment with the debtor. She made this move because she foresaw that the debtor's future was bleak given the loss of the Grunewald affiliation and she wished to continue with what she viewed as a product with commercial potential.

Once at Sunland Ms. Freitas aided Wilson and Grunewald in the preparation of fact sheets and customer and price lists. The promotional materials produced used language very similar to that used by the debtor in its fact sheets, much of which had been originated by Mr. Grunewald. The prices set by Sunland differed from the debtor's by only a few pennies per unit, if at all, and the same identification numbers were used.

Ms. Freitas attempted to contact all the dealers and distributors she knew who would handle such a product as the Power Swing. She had become acquainted with many of these dealers and distributors while employed by the debtor. She also contacted others relying on commercial trade listings which had been obtained by Mr. Wilson. In addition, she attended trade shows where she met other dealers and distributors who she informed regarding the termination of the relationship between Mr. Grunewald and the debtor.

### III

### DISCUSSION

A. *Breach and Termination of the License Agreement*

The central issue here deals with the manner in which Mr. Grunewald terminated the license agreement. The fact that the debtor was obligated to pay royalties, and did not since May of 1979, is not disputed.[6] The debtor contends, however, that: (i) the license was never effectively terminated; or alternatively (ii) that such termination cannot be enforced because of waiver, estoppel and unclean hands.

██ The license agreement defines the manner in which it may be terminated. It requires that the licensee be given sixty (60) days notice of the impending termination so that any default could be cured. Mr. Grunewald's letter of June 11, 1979, did exactly that. Unfortunately, the debtor's default

---

**6.** The amount of accrued and unpaid royalties and other charges owed Grunewald Enterprises remains undetermined. Resolution of this issue will be accomplished in a hearing to be scheduled by this Court.

was not cured within the sixty day period. As of August 11, 1979 then, the license agreement was terminated.

■ It is true that Mr. Grunewald negotiated with the debtor during the cure period, but in doing so he cannot be said to have waived his election to terminate. A waiver involves an intentional and voluntary relinquishment of a known right. *See e. g., Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1208 (9th Cir. 1970). While Mr. Grunewald desired to rectify the royalty problems, he at no time retracted his notice of default, or otherwise indicated that the agreement would not be terminated.

His attempt to negotiate the bogus check given him by Mr. Stephenson, and his discussions with the debtor after the check had been dishonored do not demonstrate a waiver either. These actions simply do not disclose an unequivocal choice not to exercise, or to abandon, a legal right.

■ The debtor alternatively contends that the equitable defenses of estoppel and unclean hands preclude enforcement of the termination. These claims are without merit. For an estoppel to arise one must knowingly act so as to lead another, without knowledge of the facts, to act on the basis of the conduct to his detriment. *See e. g., United States v. Ruby Co.*, 588 F.2d 697, 703 (9th Cir. 1978). Here, Mr. Grunewald wanted to salvage his arrangement with the debtor and desired to improve the debtor's deteriorating financial condition. This does not mean, however, that he intended, or the debtor could reasonably have believed, that the license would not be terminated if the royalties were not paid. The debtor, moreover, was fully aware of all the pertinent facts and knew that the royalty demand was never withdrawn. This understanding was demonstrated by Mr. Stephenson's desperate last minute attempt to comply with the royalty demand by issuing the unfunded check.

The debtor's unclean hands theory is equally unpersuasive. The conduct which gives rise to this defense has not been specified by the debtor. This is not surprising, for Mr. Grunewald did not engage in the type of conduct which traditionally supports an application of this defense. *See, e. g., Washington Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 478 (9th Cir. 1969).

Therefore, this Court finds that the license agreement was properly terminated as of August 11, 1979, and concludes that as of that date the debtor had no further rights to manufacture and market the Power Swing under the agreement. However, the debtor argues that the Grunewald patent is invalid. If so, then the debtor is not restricted in its use or sale of these devices. Thus, the validity of the Grunewald patent must be considered.

### B. *The Validity of the Patent*

#### 1. *Preliminary Considerations*

The debtor challenges the validity of the Grunewald patent on several grounds. Invalidity is claimed on the basis of prior use or sale. *See* 35 U.S.C. § 102(b). Secondly, it is argued that Mr. Grunewald's invention is anticipated by the prior art. *See* 35 U.S.C. § 102(a). And finally, the debtor contends that the Grunewald patent is invalid because it is obvious to a person of ordinary skill in the art. *See* 35 U.S.C. § 103.[7]

On the other hand, Mr. Grunewald, in turn, initially questions whether the validity or invalidity of his patent is even at issue, because the license agreement requires royalties to be paid even if the patent is invalid. In fashioning his argument, reliance is placed on *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979).

In *Quick Point*, the Supreme Court held that a licensor of an invention who was applying for a patent, was entitled to receive royalties owed under the license even

7. The remaining criteria of patentability, utility, *see* 35 U.S.C. § 101, is not questioned by the debtor.

though the patent was denied, when failure to obtain a patent was specifically provided for in the agreement by merely reducing the royalty obligation. 440 U.S. at 262–65, 99 S.Ct. at 1099–1100. The licensor could then collect royalties as long as the licensee exploited the invention, even though it was not a patentable one. Here, there is a similar, but not identical, situation: Mr. Grunewald *had* a patented invention *and* a contractual right to receive royalties if the patent was later declared invalid.

While Mr. Grunewald's argument is not without some force, it overlooks the impact of *Lear v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). In *Lear,* the Supreme Court held that a licensee of a patented invention could challenge the validity of the patent and would not be liable for accrued royalties if the patent was ultimately declared invalid. This decision was based upon the Court's conclusion that the enforcement of the contractual provision concerning royalty payments would undermine the strong federal policy favoring the full and free use of ideas in the public domain. *Lear v. Adkins, supra,* 395 U.S. at 670–71, 674, 89 S.Ct. at 1911, 1913.

In *Quick Point* the Court approved a reduced royalties provision where no patent was ever issued and no ideas had therefore been withdrawn from the public domain. The Court further stressed the special advantage that a licensee gains in a patent pending situation where the information contained in the patent application must be kept confidential by the PTO. In *Quick Point* the Supreme Court did nothing to limit *Lear* and noted the:

> desirability of encouraging licensees to challenge the validity of patents, to further the strong federal policy that only inventions which meet the rigorous requirements of patentability shall be withdrawn from the public domain.

*Aronson v. Quick Point Pencil Co., supra,* 440 U.S. at 264, 99 S.Ct. at 1100.

■ Here, on the other hand, when the exclusive license was granted to the debtor

a patent had been issued. The parties anticipated the possibility that at a later date it might be declared invalid. If invalidity was found then the agreement provided that the minimum royalties would no longer be due, and the per unit royalty would be reduced from $.50 per unit to $.25. This is a significant royalty reduction and provides *some* incentive for the licensee to challenge the validity of the patent. But its natural effect is to undermine the public policy, enunciated in *Lear,* of encouraging licensees to attack patents which unjustifiably withdraw ideas from the public domain. While an alternative royalty provision may be appropriate in a patent pending situation, with its special confidentiality advantage, it has no place in a case, such as this, where the patent had already been granted. Here, this provision must be declared a nullity as it violates public policy.[8]

Given that *Quick Point* has no application to this case, and *Lear* controls, then we must determine the validity of Mr. Grunewald's patent.

### 2. The Invention and the Presumption of Validity

The Power Swing is an exercise device used in conjunction with other sports implements, particularly baseball bats. It is said to develop strength and quickness in the swing of the user by employing equally spaced planar air resistance vanes secured to a tapered tubular means and extending radially outward therefrom. When the apparatus is inserted over the hitting, or contact end of a swinging implement, such as a baseball bat, it produces air resistance when swung. The air resistance impedes the swing, and thus develops the muscles used in the swing thereby strengthening and quickening it. This occurs regardless of the rotational orientation of the bat or other implement. *See* Figs. 1–4, APPENDIX.

These factors distinguish it from devices employing the concept of a weighted swing, and those having less than three planar

---

**8.** Such a provision may have some validity, once a patent is declared invalid, for *future* payments required solely for use of the trademark.

vanes. In the latter instance, such devices are aerodynamically influenced by positioning and can lose effectiveness if not oriented correctly in the user's hands. In the case of the former, inertia created by swinging a weight *decreases* the conditioning effect in the latter part of the swing. The Power Swing is said to avoid these problems by relying on air resistance which involves a diminished inertia effect. It produces the greatest conditioning when it is swung at maximum speed. It also uses four air resistance vanes which limits its susceptibility to rotational orientation.

The Grunewald patent carries with it a statutory presumption of validity. In this regard, Section 282 of the Patent Act ("Act") provides: "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on the party asserting it." 35 U.S.C. § 282. The debtor, however, disputes its application here, relying on the rule that the presumption is dissipated when all relevant prior art was not considered by the examiner in determining patentability. *See e. g., Hensley Equipment Company v. Esco Corporation,* 375 F.2d 432, 435 n.3 (9th Cir. 1967).

■ In support of this contention, the debtor has referred the Court to the Walton patent, No. 2,143,337, which was not cited by the examiner. For the reasons discussed *infra,* in connection with obviousness, the Walton patent does not dissipate the presumption. In short, Walton's device is simply not pertinent prior art as it has nothing to do with conditioning achieved by air resistance. Therefore, in accord with the rule that "cumulative", "equivalent" or less "pertinent" uncited prior art will not affect the presumption, it will be given effect here. *See e. g., Cool-Fin Elec. Corp. v. International Elec. R. Corp.,* 491 F.2d 660, 661 n.2 (9th Cir. 1974). Accordingly, invalidity must be shown by clear and convincing evidence. *See Speed Shore Corp. v. Denda,* 605 F.2d 469, 471 (9th Cir. 1979).

9. The parties having agreed that the filing date of Mr. Grunewald's original patent application

### 3. *Novelty*

The debtor alleges prior use or sale of the Power Swing, thereby invalidating the patent under Section 102(b) of the Act. 35 U.S.C. § 102(b). This section provides in part: "A person shall be entitled to a patent unless... (b) The invention was... in public use or on sale in this country, more than one year prior to the date of the application for patent...." The crucial date here, therefore, is August 8, 1970.[9]

■ The evidence presented at trial revealed that Mr. Grunewald apparently attempted to commercially exploit his invention in the Summer of 1971, prior to the filing of his original application. Whether that activity can or cannot be characterized as a "use" or "sale" under Section 102(b) is not controlling, however, as his actions occurred *within* the one year period. The Court therefore rejects the contention that the statutory bar of Section 102 is applicable here.

■ The debtor also argues that the prior art anticipates Mr. Grunewald's device. The Court does not agree. Anticipation is a technical defense occurring only where the same, or virtually identical device has previously been disclosed in the art. *See Harig Products, Inc. v. K. O. Lee Co.,* 195 U.S.P.Q. 292, 294 (N.Ill.1977), *aff'd* 594 F.2d 609 (7th Cir. 1979); *Popeil Bros. Inc. v. Schick Electric, Inc.,* 494 F.2d 162, 164 (7th Cir. 1974). Here, the prior art does not meet this demanding standard, principally because none of the prior art references disclose a similar or virtually identical exercise device utilizing an air resistance principle. *See* Part 4a, *infra.* Therefore, the Power Swing is a novel invention within the meaning of Section 102.

### 4. *Obviousness*

To be patentable an invention must also possess nonobviousness. The Act sets out this requirement as follows:

A patent may not be obtained though the invention is not identically disclosed

is the date from which the one year period is calculated.

or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103.

This section received its definitive interpretation in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). There, the Court noted that while the ultimate question of patentability is one of law, Section 103:

> ... lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

*Graham v. John Deere Co., supra*, 383 U.S. at 17, 86 S.Ct. at 693.[10]

a. *The Prior Art*

Seven prior art references were considered by the examiner in assessing the patentability of the Power Swing. In addition to this, the debtor has referred the Court to an additional, uncited prior art device.

The White patent, No. 3,463,492, discloses a device with a plurality of elongated blades secured to a baseball bat, such that the blades extend outwardly from the striking surface of the bat in opposite directions. The blades, or vanes, are equally spaced about the bat. This device enables the batter to gauge the direction of his swing and determine the point of contact between the ball and the bat.

The Hamilton patent, No. 3,521,883, involves a weighted "doughnut" device. It consists of a "truncated cone having a conical bore" thereby allowing it to be slipped over a baseball bat. This increases the weight of the bat, and when it is swung by the hitter, the force needed to accelerate the added weight develops the wrist and forearm muscles of the hitter.

The Berzack patent, No. 2,957,273, is entitled "Action Toy Savings Bank". It reveals a small toy coin savings bank which resembles a rocket. It rests in an upright position and is provided with a means "for impelling a vertically disposed coin therein-to." Insofar as this patent is relevant here, Berzack discloses "fixedly mounted [fins] ... evenly circumferentially disposed around the body" of the rocket. These fins are "adapted to support the same with the longitudinal axis of the body in a vertical position...."

The Slivinsky patent, No. 3,476,625, deals with a patented *method* as opposed to a device. It deals with a method of forming helicopter rotor blade spars by molding about a metal spar tube, fiber and plastic resin filler material with glass cloth wrapping. This technology was cited by the examiner as *teaching* the use of glass reinforced plastic construction.

The Coppens device is disclosed in a French patent, No. 1,148,188. It shows the familiar stabilizer found on the end of arrows. It is comprised of a three vaned tubular piece which is slipped over the end of the arrow. The vanes are equally spaced about the tubular means.

Collard's invention is somewhat similar. It is disclosed in a British patent, No. 353,-638, entitled "Improvements in Darts for Games", and relates to a "detachable dart flight head ... which is attached to a tapered tube." It dispenses with the use of feathered dart heads which soon become damaged in play, rendering the dart useless. Insofar as it is relevant here, the Collard patent discloses a tapered tubular body

---

**10.** Secondary considerations of obviousness, *see Graham v. John Deere Co., supra*, 383 U.S. at 17–18, 86 S.Ct. at 693–694, such as commercial success, long felt but unsolved needs, failure of others, etc., have not been raised by the parties.

with attached "wings", or vanes, spaced equally on the tubular body.

The Walton patent, No. 2,143,337, was not cited to, or by, the examiner. It involves an "Indian Club" and similar exercising devices, and consists of a handle, a plurality of radially spaced vanes, and a tubular compartment formed by the inner edges of the vanes. The chamber can be filled with weights thereby increasing the device's weight. When the club is then swung, the force needed to accelerate it develops the user's muscles.

And finally, the PTO referred to an article in *Machine Digest* concerning the properties of polycarbonate plastics as thermoplastic molding compounds. This reference was cited primarily to show that the Power Swing was made of a substance which was old in the art.

b. *Differences Between the Invention and the Prior Art*

The gap between the prior art and the Power Swing appears evident to the Court. The prior art contains no references to air resistance vanes which are used to accomplish exercise and conditioning. It is true that some of the art employs vanes and some of its describes exercisers, however, those devices rely on the force needed to accelerate an increased mass for conditioning, and use vanes for a function other than air resistance.

For example, Walton teaches nothing about air resistance. Its radial vanes are used only to form the contours of the "Indian Club" and its weight compartment. Hamilton is also different. Like Walton, it develops increased strength through the effort exerted in swinging a weight. It employs no air resistance vanes. White, on the other hand, has no relation to developing strength or quickness in the user's swing. While it does have a plurality of equally spaced vanes, they test only the *accuracy* of the swing, and seek to promote better contact with the ball. They have no air resistance function.

Both Coppens and Collard have nothing to do with exercise or conditioning. They are relevant only insofar as they suggest a template for Power Swing's vanes. These devices employ their vanes as aerodynamic stabilizing, or directional means. While it is true that they have equally spaced vanes attached to a tubular body, they do not teach air resistance. Berzack appears to be the least relevant of all. This device utilizes vanes only as support stands for a toy. They have nothing to do with sports or conditioning, and do not teach any form of air resistant principle.

Finally, Slivinsky and the *Machine Digest* article relate to one aspect of the Power Swing: the material and method of its construction. These references teach that glass reinforced plastic and molding technology were perfected when Mr. Grunewald invented the Power Swing. Preferably, the Power Swing is made from injection molded ABS polycarbonate plastic, however, it appears that the method outlined in *Slivinsky* would not even be used in its manufacture.

c. *The Level of Ordinary Skill*

■ Having ascertained the scope, content and dissimilarities of the prior art, the Court must now establish the level of ordinary skill in the pertinent art. This requires the Court to discern the "range of ingenuity" of a person of such ordinary skill in the art at the time the invention was made. *See Reiner v. I. Leon Co.*, 285 F.2d 501, 503–4 (2d Cir. 1960) (L. Hand, J.). This can be determined only by an analysis of the problem allegedly solved by the invention and the efforts of others to solve it. *See e. g., Reeves Instrument Corporation v. Beckman Instruments, Inc.*, 444 F.2d 263, 271 (9th Cir. 1971). The hypothetical person of ordinary skill in the art knows *all* the relevant prior art disclosed at the time of his invention, *see e. g., Cool-Fin Elec. Corp. v. International Elec. R. Corp., supra*, 491 F.2d at 662 n.7, and will also draw every inference from the prior art that one skilled in the art would make. *See Steelcase, Inc. v. Delwood Furniture Co., Inc.*, 578 F.2d 74, 79, 199 U.S.P.Q. 69, 73 (5th Cir. 1978).

Mr. Grunewald sought to construct a device which would enable one to condition the muscles used in swinging a baseball bat. He also wanted to avoid the inertia effect common to those devices employing a weighted swing concept, while achieving resistance through the arc of the user's swing. To solve this problem, he employed the principle of air resistance which increases throughout the swing. As the Court reads the prior art, no earlier inventor used this principle although some vane, or "blade" configurations and swing resistance devices (weighted) were established in the art.

Given the nature of the Power Swing, the prior art, the evidence before this Court, and the inferences drawn therefrom, the level of ordinary skill here would appear to be relatively low. *See e. g. Steelcase, Inc. v. Delwood Furniture Co., Inc., supra,* 578 F.2d at 80, 199 U.S.P.Q. at 73–74. We are not dealing with complex electronic or mechanical technology, nor are we considering an abstruse chemical patent. What the Power Swing and the prior art disclose, rather, are the work product of the classic backyard "tinkerer", *see Sensytrol Corporation v. Radio Corporation of America,* 190 F.Supp. 121, 122 (S.N.Y.1961), *aff'd,* 289 F.2d 938 (2d Cir. 1961); *Perma Research & Development Co. v. Singer Co.,* 402 F.Supp. 881, 885 (S.N.Y.1975), *aff'd,* 542 F.2d 111 (2d Cir. 1976), the individual who works, usually on his own, and ordinarily in a field of relatively simple technology both in terms of the materials being used and the principles of operation.

d. *Nonobviousness*

 The final inquiry under *Graham* involves whether the differences between the prior art and the claims in issue are "sufficient to render the claimed subject matter

unobvious to one skilled in the applicable art ...." *Dann v. Johnston,* 425 U.S. 219, 228, 96 S.Ct. 1393, 1398, 47 L.Ed.2d 692 (1976).[11] The Court is also mindful of the fact that in evaluating the Power Swing against the standards of Section 103, hindsight and the disclosures of the patent in suit cannot be resorted to. *See e. g., Egley v. United States,* 576 F.2d 309, 317 (Ct.Cl. 1978). Also, even *minor changes* from the prior art can produce a patentable invention so long as they could not have been foreseen by a person of ordinary skill in the art. *Penn Intern. Industries v. Pennington Corporation,* 583 F.2d 1078, 1082 (9th Cir. 1978).

The debtor's argument must be contrasted against this backdrop, placing emphasis on the White and Walton patents. It is urged that White teaches all that is involved in the Power Swing except that the Power Swing has more vanes and is less susceptible to rotational orientation. This gap is then closed by Walton's "Indian Club" apparatus as it purportedly teaches the usage of more than two air resistance vanes.

The prior art does not suggest anything about deriving strength or conditioning from radially spaced planar air resistance vanes. Indeed, several of the prior art references have nothing to do with swinging implements, exercise, or the application of any physical principles in exercise. The analogous art, Walton and Hamilton, describe an exercise principle based on the use of muscular force to accelerate a weight, a theory entirely different from that advanced by Mr. Grunewald. Taken as a whole then, these references do not suggest that the Power Swing was obvious to one of ordinary skill in the art.

11. The Court has concluded that the standards for judging the nonobviousness of so-called "combination patents" are inappropriate here. Therefore, the Court need not inquire into whether the Power Swing produces a "synergistic" effect or discloses "new and surprising results." *See Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 282, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976); *Photo Electronics Corp. v. England,* 581 F.2d 772, 775 (9th Cir. 1978); *Palmer v. Or-*

*thokinetics, Inc.,* 611 F.2d 316, 323 n.15 (9th Cir. 1980) ("more severe test"). Practically every patent involves a combination of elements old in the art; "the issue is whether bringing them together ... was obvious in light of the prior art." *United States v. Adams,* 383 U.S. 39, 50, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966). *Accord, Nickola v. Peterson,* 580 F.2d 898, 912 n.22, 198 U.S.P.Q. 385, 400 n.22 (6th Cir. 1978).

This being the case, the Power Swing meets the test of Section 103. Since the debtor also did not sustain its burden of showing that the Power Swing was not novel, and did not question its utility, all three criteria of patentability have been met. Accordingly, Mr. Grunewald's ingenuity and efforts are to be rewarded with patent protection.

### C. *The Scope of the Patent*

The debtor also questions whether the Power Swing can be adapted to sports other than baseball, assuming the Grunewald patent is valid. It is argued that through amendment of his original claims, and remarks made to the PTO, Mr. Grunewald is estopped to claim application of his device to other sports. The debtor relies particularly on a statement made by Mr. Grunewald's patent counsel to the examiner. As an explanatory remark included in the amended claims, counsel opined: "the [prior art] references cited are not . . . applicable to the newly presented claims in that those claims are now specific to the use of the device as an exercise device on a baseball bat and the claims now recite the structure which is unique to that function."

To ascertain the scope of the Grunewald patent, its claims must be examined, for they measure the monopoly granted thereby. *See e. g., Nelson v. Batson*, 322 F.2d 132, 134 (9th Cir. 1963). Construction of those claims is also aided by the patent's specifications, and the claims are to be read in that light. *See Coleco Industries v. United States Intern., Etc.*, 573 F.2d 1247, 1257 (CCPA 1978). Here, an examination of the patent reveals that the words "bat" and "baseball bat" are used throughout the claims and specifications.

■ This does not mean, though, that the Power Swing is limited in its application to baseball. For the doctrine of equivalents can enlarge the bounds of claims to include more than their literal words embrace. This doctrine is applicable when a device performs substantially the same function, in substantially the same way,

achieving the same results as the device that is patented, even though the two differ in name, form and shape. *See Graver Mfg. v. Linde Co.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950); *Interdent Corp. v. United States*, 531 F.2d 547, 550 (Ct.Cl.1976).

■ The Power Swing concept has been utilized in tennis, racquetball and golf, and these applications employ substantially identical Power Swing devices to achieve the same results, in the same way. Therefore, these embodiments are classic equivalents of the Power Swing.

■ The debtor seeks to avoid the doctrine of equivalents through application of the file wrapper estoppel principle. This doctrine holds that where original claims are narrowed in response to PTO objections, the patentee is thereafter estopped to assert a broader interpretation of his claims. *See Exhibit Supply Co. v. Ace Corp.*, 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942); *Micro-Probe Inc. v. Wentworth Lab.*, 622 F.2d 433 (9th Cir. 1980).

■ A careful reading of the Grunewald patent's file wrapper, however, renders the debtor's position untenable. First of all, insofar as the amendments were prompted by objections based on vagueness, *see* 35 U.S.C. § 112, they cannot give rise to an estoppel. *See e. g., Schimizzi v. Chrysler Corp.*, 462 F.Supp. 630, 634 (S.N.Y.1978).

Secondly, the objections to the original claims had nothing to do with their scope. They pertained to the manner in which Power Swing's vanes were attached to its tubular body and how the body was affixed to the bat. The other amendments dealt with the number and spacing of the vanes, their tapering and extension and the tapering of the body. The amended claims, therefore, were in no way *narrowed* in response to the objections, as the terms "bat" and "baseball bat" were used in both versions of the claims. The claims were simply clarified and made more precise.

Although the remarks of patent counsel trouble the Court, they will not work as an estoppel. When read in context with his entire statement it is clear that counsel did not intend to narrow the scope of his client's invention. He was merely *distinguishing* the applicability of the prior art references. Given the deficiencies dealt with by the amendment and the substance of the entire statement, the remark in question can only be viewed as an errant and unnecessary opinion.

The Grunewald patent, therefore, extends to applications other than baseball, insofar as those embodiments are consistent with the doctrine of equivalents. Therefore, future unauthorized manufacture of equivalent devices by the debtor would be improper.[12]

### D. *The Infringement and Unfair Competition Claims*

### 1. *Patent and Trademark Infringement*

The debtor raises the issue of patent infringement with respect to Mr. Grunewald's license arrangement with Sunland. The agreement allegedly infringes on the debtor's right to exploit the Grunewald patent, and should therefore be enjoined.

■ This contention is easily disposed of, for at the inception of Mr. Grunewald's dealings with Sunland, the debtor had no rights in the Grunewald patent. Its license had been terminated months earlier and the debtor had no license rights which could be infringed.

Trademark infringement is also charged by the debtor based on the Grunewald-Sunland license. The debtor advances no theory in support of an independent property right in the name Power Swing. To establish its purported trademark rights, the debtor relies on the continuing validity of its license. This reasoning is also faulty.

■ The right to use the name Power Swing was granted to the debtor by its license with Mr. Grunewald. It did not grant the debtor any independent rights in the name Power Swing, and when the license was terminated, so was the debtor's right of use. The license also expressly provides that in the event of termination all rights in the mark Power Swing automatically reverted to the licensor. Accordingly, Sunland's use of the name Power Swing was not an infringement.

■ Mr. Grunewald also charges trademark infringement with respect to the debtor's continued and unauthorized use of the mark, Power Swing. He advances a common law trademark theory in support of this contention, based on his origination, use and identification of his invention with the name Power Swing. The debtor does not challenge this, and the evidence supports the conclusion that trademark protection exists in Mr. Grunewald's favor, for usage, not registration, confers the right to a trademark. *See e. g., WGBH Educational Found. v. Penthouse Intern.,* 453 F.Supp. 1347, 1350 (S.N.Y.1978), *aff'd* 598 F.2d 610 (2d Cir. 1979). *See also* Cal.Bus. & Prof. Code § 14207 (West) (California's definition of "trademark"). Since the debtor lost all rights to employ the mark when its license terminated, continued use constitutes an infringement, *see Anti-Monopoly, Inc. v. General Mills Fun Group,* 611 F.2d 296, 306 (9th Cir. 1979) (elements of infringement), and the debtor should refrain from further unlawful conduct in this regard. *See e. g., Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 615 (7th Cir. 1965) (federally registered mark).

### 2. *The Unfair Competition Claims*

Here, the debtor alleges that Mr. Grunewald, Sunland and Ms. Freitas: (i) falsely represented to customers, and potential customers, that the debtor was insolvent and

---

**12.** The debtor also raises the issue of "patent misuse", claiming that the licensing of applications of Power Swing to sports other than baseball constitutes an abuse of the patent grant.

In light of the conclusion regarding the scope of the Grunewald patent, this argument is also disposed of, as the applications in question are covered by the patent.

unreliable; (ii) that Sunland and Mr. Grunewald attempted to unlawfully solicit the employment of the debtor's employees; and (iii) that Mr. Grunewald, Sunland and Ms. Freitas misappropriated certain of the debtor's trade secrets to injure the debtor's business.

These contentions are all without merit. The false representation claim was unsupported by the evidence at trial. Nor was there any showing of a specific, concrete harm resulting from the alleged conduct.

With respect to the charge of solicitation, it is also clear no actionable wrong occurred. First of all, proof of any unlawful solicitations was inadequate. The evidence, rather, shows that Ms. Feitas became employed by Sunland based on her own assessment of the debtor's financial condition and the new license with Sunland. When it became apparent that the debtor had no prospect of continuing viability, she terminated her employment there and then went to work for Sunland.

In any event, without proof of concomitant unconscionable conduct, the mere solicitation of an employee (under no contract) to leave and associate with a competitor is not actionable. *See Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324 (9th Cir. 1980).

This brings us to the question of trade secret misappropriation. Clearly, this type of conduct, when *combined* with employee solicitation can be illegal. *See Hollingsworth Solderless Terminal Co. v. Turley, supra,* 622 F.2d at 1337. Here, however, the crucial question of whether the information used involved "trade secrets", was left unanswered by the debtor. There was no showing that the customer information was not readily accessible to a reasonably diligent competitor or, that the information related to customers who had special re-

quirements peculiarly within the knowledge of the debtor. Additionally, Mr. Grunewald, Sunland or Ms. Freitas were not shown to have acted to injure the debtor's business. *See Hollingsworth Solderless Terminal Co. v. Turley, supra,* 622 F.2d at 1330, 1332–35.

There being no indication that the disputed information was confidential and protectible as a trade secret, its later use by Sunland was not illegal. The debtor's claim of unfair competition is therefore rejected.

And finally, Mr. Grunewald complains of unfair competition too. The Court need not delve into the substance of his allegations, however, as the relief requested therein is identical to that granted in his claim for trademark infringement.

## IV

## CONCLUSION

The debtor's license with Mr. Grunewald was effectively terminated on August 11, 1979. As of that date, all rights of the debtor thereunder were extinguished. The Grunewald patent, No. 3,809,397, is valid and Mr. Grunewald has acquired a common law trademark in the name, Power Swing.

Therefore, Mr. Grunewald is entitled to an injunction restraining the debtor and its agents from further marketing of the Power Swing, and from further unauthorized use of the mark, Power Swing.[13] The debtor must further return all equipment and other items related to the manufacture of the Power Swing to Mr. Grunewald, as specified in the license agreement. Lastly, the relief prayed for by the debtor in its counterclaim, and third party action is denied in its entirety.

This opinion shall constitute findings and conclusions of law under Bankruptcy Rule 752.

---

13. Mr. Grunewald's request for treble damages for infringement and unfair competition is denied for lack of proof.