**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ELLE MELISSA MCKAY,
                        *Appellant,*

            v.

JOHN B. INGLESON,
                        *Appellee.*

No. 07-35362

D.C. No.
CV-07-00285-GMK

OPINION

Appeal from the United States District Court
for the District of Oregon
Garr M. King, District Judge, Presiding

Argued and Submitted
December 10, 2008—Portland, Oregon

Filed February 23, 2009

Before: Diarmuid F. O'Scannlain, Susan P. Graber and
Jay S. Bybee, Circuit Judges.

Opinion by Judge O'Scannlain

## COUNSEL

Terrance J. Slominski, Slominski & Associates, Tigard, Oregon, argued the cause for the appellant and submitted a brief.

David B. Gray, Swensen & Gray, Portland, Oregon, argued the cause for the appellee and submitted a brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether a student's financial arrangement with the university she attended constituted a non-dischargeable educational loan under the Bankruptcy Code.

### I

#### A

Elle McKay, then a student at Vanderbilt University, entered into a "Vanderbilt University Graduate and Professional Student Account and Deferment Agreement" ("the Agreement") on October 2, 1996. After reciting that the parties "desire the convenience of deferring payment for . . . educational services," the Agreement states that the "[s]tudent, as purchaser of the educational services," would be billed monthly. "Any balances not paid by the end of each calendar month [would] be assessed a late fee of one and one-half (1.5%) percent per month." The Agreement further states that "[a]ll amounts deferred are due not later than" a specific date close to the end of each semester.

A "Student Account Analysis" demonstrates that McKay incurred charges totaling $13,142.07 under the Agreement. The last time the account was used appears to be May 25,

1997, but the analysis shows late fees through February 27, 1998. The charges against the account primarily consist of tuition and activity fees ($4,805.56), housing ($2,170), dining ($1,155); and the "Flexible Spending Acc[ount]" ($2,466.59).[1] There are smaller mundane charges (e.g., a chemistry lab breakage fee), but the bulk of the remaining amount is due to late fees ($2,182.50).

## B

McKay filed for bankruptcy on June 4, 2003, and was granted a discharge on September 17th of that year. In 2005, John Ingleson, an attorney hired by the University, filed a complaint in state court on its behalf, alleging that McKay did not pay her loan. In January 2006, the state court granted a default judgment. Two months later, McKay commenced the adversary proceeding at issue here against Ingleson and Vanderbilt, alleging violation of the discharge injunction under 11 U.S.C. § 524. The bankruptcy court ruled against McKay, and the district court affirmed. McKay timely appeals.

## II

**[1]** The issue on appeal is whether the Agreement constituted a "loan" under 11 U.S.C. § 523(a)(8) which, at the time of McKay's discharge,[2] made non-dischargeable a "loan . . . made under any program funded in whole or in part by a . . . nonprofit institution."

**[2]** In determining whether the Agreement constituted a loan, we look at the ordinary meaning of such term. *Barstow*

---

[1]Flexible spending account funds could be used at dining services, on-campus laundromats, the campus bookstore, the campus copy shop, the student health service (for prescriptions), and on-campus vending machines.

[2]Section 523, as amended after the passage of Pub. L. No. 107-204, 116 Stat. 801 (2002), is the relevant version for purposes of this case.

*v. IRS* (*In re Bankr. Estate of Mark Air, Inc.*), 308 F.3d 1038, 1041 (9th Cir. 2002). McKay argues that the Agreement is a revolving credit account (specifically, a credit card) rather than a loan. However, even if that is true, revolving credit accounts are considered loans in everyday parlance. *See, e.g., Gen. Elec. Capital Corp. v. Future Media Prods. Inc.*, 547 F.3d 956, 958 (9th Cir. 2008) ("The loan agreement included a $10.5 million, 42-month term loan, as well as a $5 million revolving line of credit."); *Quicken Loans, Inc. v. Wood*, 449 F.3d 944, 949-50 (9th Cir. 2006) ("In the case of an open-end line-of-credit loan, the adjustment reflects an advance taken by the borrower under the line-of-credit and is permitted by the loan contract." (quoting 12 C.F.R. § 560.35(c)).

**[3]** Dictionary definitions of the term "loan" provide further support for Ingleson's position that the Agreement constituted a loan, and the Eighth Circuit's Bankruptcy Appellate Panel has helpfully discussed some of these definitions:

> Black's Law Dictionary defines a "loan" as "[a]nything furnished for temporary use to a person at his request, on condition that it shall be returned, or its equivalent in kind, with or without compensation for its use." *Black's Law Dictionary* 936 (6th ed.1990). Webster's Third International Dictionary defines a loan similarly, as "[s]omething lent for the borrower's temporary use on condition that it or its equivalent be returned." *Webster's Third New International Dictionary* 1326 (Philip Babcock Gove ed., 1993).

> Although the definitions imply *money* as the subject of the loan transaction, they do not necessarily anticipate or even require an actual exchange of funds between the lender and the borrower. Notably, Black's Law Dictionary also defines a loan as "[t]he creation of debt by the lender's payment of or agreement to pay money to the debtor or to a third party

for the account of the debtor . . . ." *Black's Law Dictionary* 936 (6th ed.1990) . . . . The definitions do not require an exchange of funds at all. *See id.* (" 'Loan' includes . . . [t]he creation of debt by *a credit to an account with the lender* upon which the debtor is entitled to draw immediately . . . .") (emphasis added); *see also West's Legal Thesaurus/ Dictionary* 464 (William P. Statsky ed., 1986) (including among its definitions of loan an "advance, credit, accommodation [or] allowance . . . .").

*Johnson v. Mo. Baptist Coll.* (*In re Johnson*), 218 B.R. 449, 456-57 (B.A.P. 8th Cir. 1998) (some emphases omitted).

Indeed, the *Johnson* court was faced with a very similar set of facts and came to the conclusion that the arrangement in that case was a non-dischargeable student loan:

> Applying these definitions to the facts before us, we conclude that the arrangement between Johnson and the College constitutes a loan. Johnson's promise to remit the cost of tuition to the College in exchange for the opportunity to attend classes created a debtor/creditor relationship. She signed a promissory note to evidence her debt. By allowing Johnson to attend classes without prepayment, the College was, in effect, "advancing" funds or credits to Johnson's student account. Johnson drew upon these advances through immediate class attendance. It is immaterial that no money actually changed hands.

*Id.* at 457.[3]

---

[3]*See also Andrews Univ. v. Merchant* (*In re Merchant*), 958 F.2d 738, 741 (6th Cir. 1992) ("In this case Merchant signed forms evidencing the amount of her indebtedness before she registered for classes. She received her education from the University by agreeing to pay these sums of money owed for educational expenses after graduation. The credit extensions were loans for educational expenses.").

The *Johnson* court's analysis is persuasive, and we find no relevant differences between the Agreement here and the arrangement in *Johnson*.

### III

McKay points to several features of the Agreement which, in her view, are inconsistent with its being a loan. We find none of her proffered arguments persuasive.

[4] McKay argues that the loan payment must "reflect the value of the benefit actually received, rather than some other ill defined measure of damages or penalty." She also argues that the Agreement fails to quantify the educational benefit received by her. McKay is correct that the amount due on the loan must be based on the amount of benefit received. *See President of Ohio Univ. v. Hawkins*, 317 B.R. 104, 110 (B.A.P. 9th Cir. 2004). However, the cost of tuition, housing, board, and various other items and fees were readily available to her, and the amount she was required to repay was determined by the costs of these items.[4]

McKay relies on *Navarro v. University of Redlands* (*In re Navarro*), 284 B.R. 727 (Bankr. C.D. Cal. 2002), but it simply does not support her case. There, where a student merely signed an agreement acknowledging his understanding of the tuition rate but did not agree to pay in the future, no loan existed. *Id.* at 732. However, McKay did sign an agreement with Vanderbilt to repay the money prior to the commencement of the term.

McKay's final argument is that the loan agreement did not indicate a sum certain. She cites a dictum from *Navarro*. *See id.* at 734 ("[Nowhere] in [the documents executed well after

---

[4]McKay argues that to constitute a loan, the Agreement would have had to sufficiently articulate definite repayment terms. However, the Agreement states that all sums must be repaid by a date certain.

the student was enrolled] did Navarro agree[ ] to repay a sum certain in the future.") This statement is in a list of seven reasons for declaring that the agreement in that case did not constitute a loan. Even crediting the dictum, it at most establishes that whether a sum certain is stated is one of the factors that may be considered in determining whether a loan exists. We are not convinced that a loan requires a sum certain.[5]

IV

**[5]** Because McKay's student loan was exempt from discharge under § 523(a)(8), Ingleson could not have violated the discharge injunction by attempting to collect the loan.

**AFFIRMED**.

---

[5]At oral argument, McKay argued that the Agreement did not require Vanderbilt to lend her any money at all but was rather a mere promise to pay whatever sums Vanderbilt chose to charge McKay. Because this argument was not raised clearly and distinctly in the opening brief, it has been waived. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).