
FILED

**NOT FOR PUBLICATION**

AUG 15 2012

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No.  OR-11-1342-JuMkH |
| ) | |
| SHEILA NOEL CAMPBELL, ) | Bk. No.  08-65172 |
| ) | |
| Debtor. ) | Adv. No.  11-06051 |
| _____) | |
| ) | |
| SHEILA NOEL CAMPBELL, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **M E M O R A N D U M**[*] |
| ) | |
| SOUTHERN OREGON UNIVERSITY; ) | |
| OREGON DEPARTMENT OF REVENUE, ) | |
| ) | |
| Appellees. ) | |
| _____) | |

Argued and Submitted on June 14, 2012
at Boise, Idaho

Filed – August 15, 2012

Appeal from the United States Bankruptcy Court
for the District of Oregon

Hon. Frank R. Alley, III, Chief Bankruptcy Judge, Presiding

_____

Appearances:   G. Jefferson Campbell, Jr., Esq. argued for appellant Sheila Noel Campbell; Stephen T. Tweet, Esq. of Albert & Tweet, LLP, argued for appellees Southern Oregon University and Oregon Department of Revenue.

_____

Before:  JURY, MARKELL, and HOLLOWELL, Bankruptcy Judges.

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Discharged chapter 7[1] debtor, Sheila Noel Campbell, reopened her bankruptcy case and filed an adversary proceeding against appellees, Southern Oregon University ("SOU") and Oregon Department of Revenue ("ODR") (collectively, "Defendants"), seeking declaratory relief and asserting violations of the discharge injunction under § 524(a).  Defendants counterclaimed for their attorneys' fees and costs.

On cross motions for summary judgment, the question presented was whether the debt for room and board charges and miscellaneous fees[2] that debtor incurred while living in the dormitory at SOU and attending classes at nearby Rogue Community College ("RCC") fell within the scope of the "qualified education loan" exception to discharge under § 523(a)(8)(B). The bankruptcy court granted summary judgment in favor of Defendants, concluding that the debt in the amount of $15,610.99 was presumptively nondischargeable under § 523(a)(8)(B) and, therefore, not included in the discharge order.  The bankruptcy court also awarded SOU attorneys' fees and costs in the amount of $14,227.97.

For the reasons discussed below, we AFFIRM the bankruptcy court's decision granting summary judgment for Defendants but

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. "Rule" references are to the Federal Rules of Bankruptcy Procedure and "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] The miscellaneous fees included parking tickets, library fines, health insurance charges, printing and copying fees, student conduct fines, "social fees", "PE Jazz" fees, and fees to cover the cost of replacing several laundry and meal cards.

REVERSE the award of attorneys' fees and costs.

## I.    FACTS

The facts relevant to the underlying controversy are undisputed.

### Academic Year 2004-2005

Debtor was a full-time enrolled student at SOU for the academic school year 2004-2005, lived on the SOU campus, and participated in a meal plan provided by SOU.  When debtor enrolled as a student, SOU automatically established a Revolving Charge Account Plan (the "RCA") for debtor that allowed her to pay tuition and other charges with more flexibility than if payment were required upon registration or receipt of services. The RCA provided that "any credit extended . . . is an educational benefit or loan" and defined a student as "[a]ny person who is currently or has in the past been enrolled at [SOU]."  Debtor signed the RCA agreement on October 17, 2004.

At the end of the 2004-2005 school year, SOU placed debtor on academic suspension because of poor grades.  As a result, debtor could take no further classes at SOU.

### Academic Year 2005-2006

Debtor then enrolled at RCC in Medford, Oregon, for the Fall and Winter terms for the academic year of 2005-2006. Pursuant to a Memorandum Of Understanding ("MOU") between RCC and SOU, RCC students "who are dual enrolled at SOU can live on the SOU campus . . ." if there was available space.  Under this policy as implemented, debtor sought to live in the dormitory on the SOU campus and participate in a meal plan so that she could stay near her friends while attending RCC.

-3-

On September 24, 2005, debtor signed a Residence Hall Contract for the 2005-2006 school year for room and board at SOU (the "Residence Hall Contract").  By signing the Residence Hall Contract, debtor agreed that if she owed money for room and board, damages or other charges, she would not be able to receive her transcripts.  Debtor also agreed that if she owed money for room and board, damages or other charges, she would pay, and SOU reserved the legal right for recovery of, reasonable attorneys' fees, court costs, and other reasonable collections costs.  The room and board charges were billed to debtor under the RCA.

As a condition for living on the SOU campus, debtor was required to provide verification of her full-time enrollment at SOU or RCC.  Debtor provided verification that she was a full-time student at RCC for the Fall term on October 14, 2005.

Debtor attended RCC as a full-time student during the Fall and Winter terms of the academic year 2005-2006, but decided to take a break from her studies for the Spring term of 2006.  Due to the fact that she was no longer taking classes at either RCC or SOU, SOU's housing office manager advised debtor that she was to vacate her room by April 24, 2006.  Debtor moved out of the SOU dormitory on that date.

Debtor did not pay her billed room and board and miscellaneous charges from September 8, 2005 to June 20, 2006.  As of March 15, 2011, debtor owed SOU $15,610.99, consisting of a principal amount of $9,581.03 plus interest due in the amount

-4-

of $6,029.96.[3]  On December 1, 2005, SOU sent debtor's debt to the ODR for collection.

### The Bankruptcy Proceedings

On December 29, 2008, debtor filed her chapter 7 bankruptcy petition.  In Schedule F, debtor listed the debt owed to SOU for the various charges.  At no time did debtor file an adversary proceeding regarding the dischargeability of the debt owed to SOU.  On April 3, 2009, debtor obtained her discharge.

Following discharge, ODR sent debtor a demand for payment of SOU's delinquent student loan account on June 2, 2010. Debtor requested her transcript from SOU which SOU refused to release due to her outstanding bill.

On February 23, 2011, debtor moved to reopen her bankruptcy case for the purpose of filing the declaratory relief adversary proceeding.  The bankruptcy court granted her motion by order entered on February 24, 2011.

On March 4, 2011, debtor filed an adversary proceeding against Defendants.  In her complaint, debtor sought a declaration that (1) the scheduled unsecured debt owed to SOU for room and board charges[4] in the amount of approximately

_____

[3] Debtor maintains that her room and board charges should only be for the period of September 2005 to April 2006 when she moved out of the dormitory.  Debtor points to no provision in the Residence Hall Contract that shows she was entitled to a refund for the room and board charges incurred when she left prior to the end of the semester.  Our independent review of the contract shows that under Section XVIII ¶ C debtor was not relieved of her liabilities in the event the contract was terminated.  The bankruptcy court did not address this issue.

[4] Debtor's complaint did not differentiate between the
(continued...)

-5-

$10,000 was discharged; (2) the § 523(a)(8) exception to discharge did not apply to the charges because there was no evidence of a "loan"; and (3) the collection actions taken by Defendants violated § 524(a).  In connection with her contempt claim, debtor further sought the release of her transcript, actual damages and reasonable attorneys' fees.

On April 4, 2011, Defendants answered the complaint and counterclaimed for attorneys' fees and costs as authorized under the SOU Residence Hall Contract.  On the same day, Defendants filed their motion for summary judgment ("MSJ").  Defendants argued, among other things, that the debt owed to SOU for room and board and miscellaneous charges was a "loan" within the scope of § 523(a)(8)(B) due to debtor's signature on the RCA and Residence Hall Contract.  Defendants maintained that the MOU supported an interpretation of the RCA and Residence Hall Contract as applicable to debtor.  Therefore, they argued, the debt was not subject to the discharge order.[5]  According to Defendants, under these circumstances, they did not violate the discharge injunction under § 524(a) when they sought to collect the debt post-discharge.

Debtor responded, arguing that the debt for the various charges did not meet the requirements for a "qualified education loan" under § 523(a)(8)(B).  Relying primarily on McKay v.

---

[4](...continued)
charges for room and board and other fees incurred while she was living on the SOU campus.

[5] Defendants also asserted that amounts for tuition and related fees were past due, but these amounts are not at issue in this appeal.

-6-

Ingleson, 558 F.3d 888 (9th Cir. 2009) for her argument, debtor maintained that the terms of the RCA and the Residence Hall Contract were inconsistent with a "loan" because those agreements applied only to students who were enrolled at SOU.[6]

On May 12, 2011, debtor moved for partial summary judgment, incorporating the substance of her response and contending that she was entitled to recover compensatory damages, reasonable attorneys' fees and costs for Defendants' willful violation of the discharge injunction under § 524(a).  Debtor also sought a partial summary judgment ruling that Defendant SOU be required to immediately release her transcript for classes previously taken at SOU.

On June 7, 2011, the bankruptcy court granted the Defendants' MSJ and denied debtor's motion for partial summary judgment at the hearing.  On June 20, 2011, Defendants filed their "Statement of Attorney Fees, Costs and Disbursements" in the bankruptcy court, with a supporting declaration and time sheets describing the work by date.

On June 22, 2011, the bankruptcy court entered an order and judgment in favor of Defendants:  (1) declaring the debt to SOU to be a qualified educational loan, nondischargeable under § 523(a)(8); (2) finding that SOU's and ODR's actions to collect the SOU debt did not violate § 524(a); (3) declaring that SOU's actions in withholding the transcripts was proper, and (4) awarding SOU its attorneys' fees, costs and disbursements

_____

[6] At issue in McKay was whether a deferment agreement signed by the debtor while she was attending Vanderbilt University constituted a loan under § 523(a)(8)(A).

incurred in the adversary proceeding.  Debtor timely appealed the judgment.

## II.  JURISDICTION

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(I).  We have jurisdiction under 28 U.S.C. § 158.

## III.  ISSUES

A.    Whether the revolving credit agreement extended by SOU to debtor constitutes a "qualified education loan" under § 523(a)(8)(B); and

B.    Whether SOU is entitled to an award of its attorneys' fees and costs in defending the adversary proceeding.

## IV.  STANDARDS OF REVIEW

The granting of summary judgment is reviewed de novo, making all reasonable inferences in favor of the non-movant to determine whether there exists any genuine issue of material fact precluding judgment in favor of the movant as a matter of law.  Valdez v. Rosenbaum, 302 F.3d 1039, 1043 (9th Cir. 2002). We may affirm a summary judgment on any ground that has support in the record, whether or not relied upon by the bankruptcy court.  Id.

Where the bankruptcy court grants summary judgment based on its interpretation of a contract, we review the bankruptcy court's interpretation and meaning of contract provisions de novo.  See U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc., 281 F.3d 929, 934 (9th Cir. 2002).  The determination as to whether contract language is ambiguous and whether the written contract is reasonably susceptible of a proffered meaning is also a

question of law reviewed de novo. Id.

Where the bankruptcy court grants summary judgment based on its interpretation of a statute, we also use the de novo review standard. Simpson v. Burkart (In re Simpson), 557 F.3d 1010, 1014 (9th Cir. 2009).

"Awards of attorney's fees are generally reviewed for an abuse of discretion. However, we only arrive at discretionary review if we are satisfied that the correct legal standard was applied and that none of the [bankruptcy court's] findings of fact were clearly erroneous. We review questions of law de novo." Rickley v. County of L.A., 654 F.3d 950, 953 (9th Cir. 2011). To the extent the issue is whether Oregon law allows the award of attorneys' fees, our review is de novo. Fry v. Dinan (In re Dinan), 448 B.R. 775, 783 (9th Cir. BAP 2011).

**V. DISCUSSION**

Under § 523(a)(8), student loan obligations are presumptively nondischargeable in bankruptcy. "Unless the debtor affirmatively secures a hardship determination, the discharge order will not include a student loan debt." Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 450 (2004). Therefore, an action to collect on a nondischargeable student loan by a creditor after the debtor has been granted a discharge cannot be a violation of the discharge injunction. McKay, 558 F.3d at 891.

However, to be nondischargeable, the debt at issue must meet the requirements for a "qualified education loan" within the meaning of § 523(a)(8)(B). The creditor/defendant in student loan dischargeability proceedings bears the burden of

-9-

proof on this issue.  Plumbers Joint Apprenticeship & Journeyman Training Comm. v. Rosen (In re Rosen), 179 B.R. 935, 938 (Bankr. D. Or. 1995).

**A.    Section 523(a)(8)(B)**

Section 523(a)(8)(B), which was added to the student loan exception to discharge provision in 2005 with the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act, provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
> . . .
>
> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for —
> . . .
>
> (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

Section 523(a)(8)(B) expressly provides a cross reference to the Internal Revenue Code ("IRC") of 1986 which supplies the definition of a "qualified education loan" for purposes of the "any other educational loan" exception to discharge.  This cross reference to IRC § 221(d)(1) leads us down a statutory definitional path.

IRC § 221(d)(1)[7] defines a "qualified education loan":

> (1) Qualified education loan.--The term 'qualified

---

[7] In computing taxable income, IRC § 221 authorizes individual taxpayers an itemized deduction for interest paid by the taxpayer for the taxable year on any qualified educational loan.  26 U.S.C. § 221(a).  A taxpayer is entitled to a deduction under § 221 only if the taxpayer has a legal obligation to make interest payments under the terms of the qualified education loan.  Treas. Reg. § 1.221-1.

education loan' means any indebtedness incurred by the taxpayer solely to pay qualified higher education expenses-

. . .

(C) which are attributable to education furnished during a period during which the recipient was an eligible student.

IRC § 221(d)(2) defines "qualified higher education expenses":

(2) Qualified Higher Education Expense.--The term 'qualified higher education expenses' means the cost of attendance (as defined in section 472 of the Higher Education Act of 1965, 20 U.S.C. 1087ll, as in effect on the day before the date of the enactment of the Taxpayer Relief Act of 1997) at an eligible educational institution . . .

In turn, 20 U.S.C. § 1087ll, defines "cost of attendance":

(1) tuition and fees normally assessed a student carrying the same academic workload as determined by the institution, and including costs for rental or purchase of any equipment, materials, or supplies required of all students in the same course of study;

(2) an allowance for books, supplies, transportation, and miscellaneous personal expenses, including a reasonable allowance for the documented rental or purchase of a personal computer . . . , as determined by the institution;

(3) an allowance (as determined by the institution) for room and board costs incurred by the student . . . .[8]

Finally, an "eligible student" within the meaning of IRC § 221(d)(1)(C) is one who carries at least a one-half time student workload (IRC § 25A(b)(3)) and who is enrolled in a program of study at an institution of higher education (20

_____

[8] See also, McKay, 558 F.3d at 890 (concluding that arrangements for payment of tuition, and room and board, constitute student loans for purposes of § 523(a)(8)(A)).

U.S.C. § 1091(a)(1)).[9]

These detailed definitions inform us whether the elements for a "qualified education loan" have been met in this case. When Congress has enacted a definition with "detailed and unyielding provisions," as it has with the above mentioned statutes, we must give effect to those definitions even when "'it could be argued that the line should have been drawn at a different point.'" INS v. Hector, 479 U.S. 85, 88-89 (1986) (per curiam). Given the cross references to the numerous statutes cited above, a "qualified education loan" under § 523(a)(8)(B) is comprised of the following elements: (1) indebtedness; (2) used by the taxpayer; (3) solely for "qualified educational expenses" (defined as "cost of attendance" which means, among other things, an allowance for transportation, room and board, and miscellaneous personal expenses under 20 U.S.C. § 1087ll); and (4) that are attributable to education furnished during a period during which the recipient was an "eligible student" — (a) "eligible student" means one who carries at least a one-half time student workload and (b) who is enrolled in a program of study at an institution of higher education.

Debtor's primary argument on appeal is that the terms of the RCA and Residence Hall Contract are inconsistent with a

---

[9] Debtor cannot seriously contend that she was not an "eligible student" within the meaning of § 221(d)(1)(C) at the time she incurred the room and board and other charges at SOU. The record shows that she was enrolled at RCC in a full time course of study. Therefore, she was an "eligible student" within the meaning of IRC § 221(d)(1)(C).

-12-

"loan" because those agreements only applied to students who were enrolled at SOU. Debtor's argument thus raises the issue of whether she was legally obligated under the agreements when she was not a student at SOU at the time she incurred the expenses.

The term "indebtedness" as used in the Revenue Act has been construed to mean an "unconditional and legally enforceable obligation for the payment of money." Investors Ins. Agency, Inc. v. Comm'r, 677 F.2d 1328, 1333 (9th Cir. 1982). There is no requirement that money change hands, as revolving lines of credit may constitute a "qualified education loan" so long as the student uses the line of credit solely to pay qualifying educational expenses. 34 AM. JUR. 2D Fed. Taxation ¶ 18410 (2012); see also McKay, 558 F.3d at 890 (revolving credit accounts are considered loans for purposes of § 523(a)(8)). We therefore consider whether the various agreements which Defendants rely upon show that debtor legally incurred liability for the debt, as a matter of law.[10]

Here, the RCA and Residence Hall Contract are the two agreements signed by debtor. Debtor established and signed the RCA when she was enrolled at SOU as a student and later signed the Residence Hall Contract when she was enrolled at RCC. Because Oregon is the relevant jurisdiction, we look to Oregon law for the interpretative rules pertaining to contracts.

---

[10] Both the Revolving Charge Account Program and the Residence Hall Contract are governed by the Or. Admin. Rules promulgated by the Oregon State Board of Education at Or. Admin. R. 571-060-0040 and 573-070-0011, respectively.

Oregon follows the objective theory of contracts; that is, the existence of a contract does not depend on the parties' uncommunicated subjective understanding but on their objective manifestations of intent to agree to the same express terms. Dalton v. Robert Jahn Corp., 146 P.3d 399, 406 (Or. Ct. App. 2006).

In a dispute over the meaning of a contract, a party is entitled to summary judgment only if the terms of the contract are unambiguous. Milne v. Milne Constr. Co., 142 P.3d 475, 479 (Or. Ct. App. 2006). A term in a contract is ambiguous if, when examined in the context of the contract as a whole, including the circumstances in which the agreement was made, it is susceptible to more than one plausible interpretation. Batzer Constr., Inc. v. Boyer, 129 P.3d 773, 779 (Or. Ct. App. 2006). If the term or provision is unambiguous, the court construes it as a matter of law, and the analysis ends. Yogman v. Parrot, 937 P.2d 1019, 1021 (Or. 1994).

Debtor has couched the interpretative problem as centering on whether the RCA and Residence Hall Contract apply only to registered SOU students rather than to registered SOU and RCC students, such as herself. In doing so, debtor would have us ignore the circumstances surrounding her signature on the agreements and instead rely exclusively on the select language in the agreements attributed to her interpretation. However, our interpretation of the agreements involves more than the mere construction of terms and ordinary words. In determining whether debtor is legally bound by the agreements, we also consider the surrounding circumstances at the time of

-14-

contracting and the positions and actions of the parties.

We cannot ignore the factual circumstances under which debtor signed the Residence Hall Contract. Debtor could no longer attend SOU because of her grades; she enrolled at the nearby community college, RCC; and she took advantage of the consortium agreement between SOU and RCC that allowed her to live in the dormitory on the SOU campus and participate in a meal plan. These undisputed facts show that debtor used the RCA for living and other miscellaneous expenses as part of her broader effort to obtain an education at RCC.

Moreover, on these facts, debtor's reading of the Residence Hall Contract as applying only to registered SOU students leads to an unreasonable result. The Residence Hall Contract cannot plausibly be read to apply only to registered SOU students when the MOU between SOU and RCC contemplates collaboration between the two institutions for the benefit of students in the Medford area, including the use of the SOU dormitories by RCC students — a benefit which debtor took advantage of.

Debtor's proposed interpretation is not only inconsistent with the MOU, but also inconsistent with the enrollment verification letters sent to her. The first letter sent dated October 11, 2005 stated in part: "In order to live in the residence halls, you must be a <u>registered student</u> . . . ." The letter then required verification of the "Fall term class schedule from either SOU <u>or RCC</u>" to remain in the residence halls. Debtor responded to the letter by verifying that she was a registered student at RCC so that she could continue living in the SOU dormitory.

Likewise, we cannot interpret the RCA as applying only to registered SOU students.  The RCA mentions the consortium agreement between SOU and RCC in ¶ 8.  Moreover, the purpose and structure of the RCA is set forth by Or. Admin. R. 573-015-0010.  Paragraph 2(b) of that rule provides:

> (2) The following are eligible to participate in the Revolving Charge Account program:
>
> (a) Students enrolled at Southern Oregon University;
>
> (b) Any person who incurs charges, fines, or penalties at Southern Oregon University, including, but not limited to library fines, parking tickets, facilities rental charges, program user charges, and lease agreements.

When debtor incurred the room and board charges pursuant to the Residence Hall Contract, she fell into category (2)(b); she was "any person" (a registered RCC student) who incurred charges at SOU.  Furthermore, the RCA defines a "student" as "[a]ny person who is currently or has in the past been enrolled at Southern Oregon University."  Debtor would fit into this definition as well because she was a person who "in the past" was enrolled at SOU.

After a thorough examination of the RCA, the Residence Hall Contract, the MOU and the verification letters, and giving due consideration to the circumstances under which the agreements were made, we conclude there is no ambiguity in any of the documents.  Debtor's proposed interpretation of the various agreements is neither sensible nor reasonable. Deerfield Commodities v. Nerco, Inc., 696 P.2d 1096, 1105 (Or. Ct. App. 1985) ("A contract provision is ambiguous if . . . it is capable of more than one sensible and reasonable interpretation; it is

-16-

unambiguous if its meaning is so clear as to preclude doubt by a reasonable person."). Accordingly, we hold the RCA and Resident Hall Contract were legally enforceable against debtor for the room and board and other listed charges.

Even so, IRC § 221(d)(1) requires that debtor use the credit extended by SOU solely to pay for qualified education expenses. We do not find any genuine dispute that debtor used the credit extended by SOU for costs associated with her attendance at RCC. There is no dispute that the room and board charges fall squarely within the scope of 20 U.S.C. § 1087ll(3). Moreover, as more fully discussed below, we conclude that the miscellaneous charges debtor incurred also qualify as costs of attendance because those charges were associated with debtor's living in the dormitory at SOU and attendance at school. Accordingly, the revolving line of credit established by SOU was used to fund debtor's "cost of attendance." As such, these costs were "qualified higher education expenses" within the meaning of IRC § 221(d)(2).

The dissent disagrees with our conclusion, contending that the parking and other fines, medical costs, and "recreational" Jazzercise classes were not a "cost of attendance". Thus, the dissent argues that the RCA was not a "qualified education loan" for purposes of § 523(a)(8)(B). Relying on Treas. Reg. § 1.221-1(e)(4), Example 6, the dissent concludes that the revolving line of credit offered by SOU is a "mixed use loan" which is not considered a qualified education loan. Example 6 states:

> Mixed-use loans. Student J signs a promissory note for a loan secured by Student J's personal residence. Student J will use part of the loan proceeds to pay

-17-

for certain improvements to Student J's residence and part of the loan proceeds to pay qualified higher education expenses of Student J's spouse.  Because Student J obtains the loan not solely to pay qualified higher education expenses, the loan is not a qualified education loan.[11]

However, the facts of this case do not fall close to those in the example.  Moreover, although a revolving credit agreement offered by an eligible education institution may include a variety of charges, that does not transform every revolving credit agreement into a "mixed use loan".  In the end, the example cited by the dissent provides little guidance as to whether the revolving line of credit here is a qualified education loan.

Moreover, the dissent's analysis regarding "mixed use loans" ignores the fact that the term "cost of attendance" which qualifies as a "higher education expense" encompasses more than room and board.  20 U.S.C. § 1087ll defines the "cost of attendance" with a broad list of items to include tuition and fees and an allowance for books, supplies, transportation and miscellaneous personal expenses.  Read together, all the items listed have a relationship to the student's attendance at school (home improvements do not).

Here, we conclude that the miscellaneous charges have the necessary relationship to debtor's attendance at school.  She would have had no need to use the library (and incur the fines), copy or print items at SOU (and incur the fees), or replace meal

---

[11] Nonetheless, under this example the borrower may still be eligible to take a deduction on interest paid when the "loan" was secured by his or her personal residence.

and laundry cards (and incur the fees for doing so) had she not been attending school.[12]  If Congress included certain allowances for expenses as serving an educational purpose in the student loan tax statutes, we should assume it also interpreted those allowances as having an educational purpose in the Bankruptcy Code.  See Murphy v. Pa. Higher Educ. Assistance Agency (In re Murphy), 282 F.3d 868, 872-73 (5th Cir. 2002).  Because the various expenses were incidental to debtor's education, the revolving line of credit was not a "mixed use loan" so as to take it outside the definition of a "qualified educational loan".

We also find support for our interpretation in the case law.  Those Courts of Appeal which have addressed a similar issue have found that the educational nature of the loan should be determined by focusing on the substance of the transaction creating the obligation.  See Dustin Busson-Sokolik v. Milwaukee School of Eng'g (In re Sokolik), 635 F.3d 261, 266 (7th Cir. 2011) (holding that it is the "purpose of the loan which determines whether it is 'educational'."); In re Murphy, 282 F.3d at 870 (same); McKay v. Ingleson, 366 B.R. 144, 147 (D. Or. 2007) aff'd 558 F.3d 888 (9th Cir. 2009) (in determining whether a "loan" falls within the scope of § 523(a)(8)(A), the nature of the debt, if for some clear educational benefit to the debtor,

---

[12] While the dissent places emphasis on the Jazzercise charges, from what we can tell out of a total of three charges, two were credited back to the debtor.  At most, there is one $80 charge associated with the "PE Jazz" entry.  Further, the PE indicates that perhaps the class was not simply "optional" or "recreational".

should be the principal focus).  Although these cases interpreted § 523(a)(8)(A), we extrapolate from them to incorporate a compatible standard for interpreting § 523(a)(8)(B).  Bankruptcy courts have followed a similar approach when determining whether a "loan" is a "qualified education loan" for purposes of § 523(a)(8)(B).

In Rumer v. Am. Educ. Servs. (In re Rumer), 469 B.R. 553 (Bankr. M.D. Penn. 2012), the debtors maintained they were entitled to summary judgment in their favor because the lenders had not offered proof that the proceeds of the loans were used by them to pay for "costs of attendance" such as tuition, books, room and board, etc.  Relying on In re Sokolik, 634 F.3d 261, and In re Murphy, 282 F.3d 868, the bankruptcy court rejected the debtors' "narrow construction" of the term "costs of attendance".  In analyzing whether a loan is a qualified educational loan, the Rumer court observed that the focus under § 523(a)(8) was on the stated purpose for the loan when it was obtained, rather than how the proceeds were actually used by the borrower.  Id. at 562.  The bankruptcy court found that the loans in question were "educational loans" for purposes of § 523(a)(8) because the lenders were providers of educational loans, debtors applied to each lender in its capacity as a student loan provider; and each loan was entered into when debtors were college students.  Id. at 562-3.

In Noland v. Iowa Student Loan Liquidity Corp. (In re Noland), 2010 WL 1416788 (Bankr. D. Neb. 2010), the debtor certified on each promissory note that he would use the proceeds for qualified higher education expenses or for costs associated

-20-

with his attendance at school.  The debtor moved for summary judgment, arguing that because some of the funds were used for dining out, purchasing gifts, paying for expenses including travel, car insurance, and gas, and for mental health treatment and medication, the loans were not "qualified education loans" and therefore were dischargeable.  Id. at *4.  The bankruptcy court rejected the debtor's interpretation because such an interpretation would subvert the intent of [§ 523(a)(8)]:

> Permitting students to discharge student loans in bankruptcy because the student spent the money on social uses, alcohol, or even drugs would create an absurd result.  Students who used the loan proceeds to finance an education would retain the burden of paying them even after a chapter 7 discharge; irresponsible students who abused the loans would gain the benefits of discharge.

Id. at *4 (quoting In re Murphy, 282 F.3d at 873).

Although none of the above cited cases are directly on point, collectively they support a broad interpretation of what constitutes a "qualified educational loan" under § 523(a)(8)(B).  Here, as in Rumer, SOU provided the revolving line of credit to debtor because — at least initially — she was an registered student at SOU.  Moreover, she could not live at the dormitory at SOU unless she was a registered student at SOU or RCC.  Her room and board charges and other charges incurred under the RCA related to her attendance at school.  In addition, because the miscellaneous charges involved fines and other penalties, our broad interpretation also avoids the absurd result illustrated by the Murphy court.

For all these reasons, we conclude that the bankruptcy court did not err in finding that, as a matter of law, the debt

-21-

owed to SOU fell within the scope of § 523(a)(8)(B) and was therefore presumptively nondischargeable.

**B.   Attorneys' Fees And Costs**

Under Cohen v. de la Cruz, 523 U.S. 213, 118 S. Ct. 1212, 140 L. Ed. 2d 341 (1998) attorneys' fees may be awarded and declared nondischargeable in an action to determine dischargeability of debt.  However, this Panel's prior decisions clarify that: (1) an underlying contract or nonbankruptcy law must provide a right to recover attorneys' fees, and (2) the issues litigated in the dischargeability action must fall within the scope of the contractual or statutory attorneys' fees provision.  See In re Dinan, 448 B.R. at 785 (9th Cir. BAP 2011) ("under Cohen, the determinative question for awarding attorneys' fees is whether the creditor would be able to recover the fee outside of bankruptcy under state or federal law"). Accord, Bertola v. N. Wis. Produce Co. (In re Bertola), 317 B.R. 95, 99-100 (9th Cir. BAP 2004); AT&T Universal Card Servs. Corp. v. Pham (In re Pham), 250 B.R. 93, 98-99 (9th Cir. BAP 2000); see also Kilborn v. Haun (In re Haun), 396 B.R. 522, 528 (Bankr. D. Idaho 2008) (holding that, in light of Cohen, Pham and Bertola, bankruptcy court should inquire whether creditor "would be entitled to fees in state court for establishing those elements of the claim which the bankruptcy court finds support a conclusion of nondischargeability."), cited with approval in In re Dinan, 448 B.R. at 785.

In Oregon, absent an applicable statutory or contractual provision, attorneys' fees will not be awarded.  Mattiza v. Foster, 803 P.2d 723, 725 (Or. 1990).  A party seeking to

-22-

recover attorneys' fees must plead the grounds that would permit their recovery. <u>Mulier v. Johnson</u>, 29 P.3d 1104, 1108 (Or. Ct. App. 2001). Here, in their counterclaim, Defendants referred to the terms of ¶¶ XII and XXI in the Residence Hall Contract, which entitled them to recover fees incurred as "collection costs" or incurred in an action brought by SOU to recover possession of student housing or to enforce the terms of the Residence Hall Contract. Paragraph XII, entitled "Payments" provides in relevant part:

> E. . . . SOU also reserves the legal right for recovery of reasonable attorney fees, courts costs, and other reasonable collection costs . . . .

Paragraph XXI, entitled "Legal Costs" provides in relevant part:

> I understand that I shall pay all costs of proceedings by SOU to recovery [sic] of the possession of the premises, or for the enforcement of any of the terms and conditions of this lease, including reasonable attorney's fees.

The scope of these attorneys' fees provisions is a matter of contract interpretation, which in turn depends upon the parties' intent. <u>Quality Contractors, Inc. v. Jacobsen</u>, 911 P.2d 1268, 1271-72 (Or. Ct. App. 1996). To determine the parties' intent, the court must look to the language of the contract, and also may look to the surrounding circumstances. <u>Id.</u> The court also might construe an ambiguous contract term against the drafter. <u>Id.</u>

We conclude that the issue addressed in Campbell's adversary proceeding was not within the scope of the Residence Hall Contract's attorneys' fees provisions. Campbell did not dispute that she was liable under the Residence Hall Contract or the amount of that liability. Rather, the dispute centered on

-23-

whether her obligations under the Residence Hall Contract constituted a "qualified education loan" for purposes of § 523(a)(8)(B).

Accordingly, the adversary proceeding was an action to determine the status of the loan, not to collect it. As this is merely an action to declare the status of the loan, it is not a "collection action" or within the scope of an action to enforce the terms of the Residence Hall Contract. Under In re Haun, 396 B.R. 522, Defendants would not have been entitled to contractual attorneys' fees for establishing in state court that Campbell's Residence Hall Contract obligations constituted a "qualified education loan" within the meaning of § 523(a)(8)(B).

Our view is consistent with Oregon case law. Under Oregon law, contracting parties are free to limit the right of the prevailing parties to recover attorneys' fees to certain instances. Harris v. Cantwell, 614 P.2d 124, 126-27 (Or. Ct. App. 1980). Consequently, Oregon courts will deny attorneys' fees claims when the claim is based upon an action that is beyond the scope of the subject contractual fees provision. See, e.g., Greenwade v. Citizens Bank of Or., 624 P.2d 610, 615 (Or. Ct. App. 1981); Harris, 614 P.2d at 126-27.

Nor does citation to Or. Rev. Stat. § 20.096.(1)[13] advance

_____

[13] Or. Rev. Stat. § 20.096(1) states:

In any action or suit in which a claim is made based on a contract that specifically provides that attorney fees and costs incurred to enforce the provisions of the contract shall be awarded to one of the parties, the party that prevails on the claim shall be entitled

(continued...)

-24-

the attorneys' fees claim, because that statute does not provide an independent basis on which to claim attorneys' fees; rather, it simply makes certain unilateral attorneys' fees clauses reciprocal. See Jacobsen, 911 P.2d at 1270; Bliss v. Anderson, 585 P.2d 29, 31 (Or. Ct. App. 1978).

The parties here could have set forth in their Residence Hall Contract a broad-based right to attorneys' fees by providing for the recovery of attorneys' fees in any litigation arising out of the Residence Hall Contract, or by using any other similarly-broad language. Instead, the contract uses much narrower language, limited to collection actions and actions to enforce the terms of the contract. No where is litigation over the status or characterization of the loan mentioned. Especially given the summary judgment setting, this factual issue as to the intent and meaning of the attorneys' fees clause requires further development. See Jacobsen, 911 P.2d at 1271.

In sum, Campbell's adversary proceeding did not contest her liability, but rather only asserted that her obligations under the Residence Hall Contract had been discharged in her bankruptcy case because they did not constitute a nondischargeable student loan within the meaning of the Bankruptcy Code. Moreover, the only issue addressed on summary judgment was whether Campbell's debt to Defendants was a

---

[13](...continued)
to reasonable attorney fees in addition to costs and disbursements, without regard to whether the prevailing party is the party specified in the contract and without regard to whether the prevailing party is a party to the contract.

-25-

"qualified education loan" under § 523(a)(8)(B).  Under these circumstances, we conclude that Defendants were not entitled to their reasonable attorneys' fees and costs.

**VI.   CONCLUSION**

For the reasons stated, we AFFIRM the bankruptcy court's decision granting summary judgment for Defendants but REVERSE the award of attorneys' fees and costs.

MARKELL, Bankruptcy Judge, dissenting:

I respectfully dissent.  I disagree with the majority's conclusion that the debt Campbell incurred under both the RCA and the Residence Hall Contract was a "qualified education loan" within the meaning of § 523(a)(8)(B).[1]

The majority indicates that Campbell's debt arose from a combination of two contracts Campbell signed: (1) the RCA, and (2) the Residence Hall Contract.  Opinion at pp. 3-6.  The Defendants' memorandum filed in the bankruptcy court in support of their summary judgment motion confirms this point.[2]

As the majority acknowledges, to be nondischargeable under

---

[1] I adopt the definitions used in the majority opinion.

[2] The identification of the agreements from which the indebtedness arose is essential to establishing that a "loan" has been made for purposes of § 523(a)(8), especially when, as here, no money actually changed hands.  See McKay v. Ingleson, 558 F.3d 888, 890 (9th Cir. 2009); see 4 COLLIER ON BANKRUPTCY ¶ 523.14[1] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2012) ("To constitute a 'loan,' the creditor must have actually transferred funds to the debtor or the parties must have entered into an agreement for the extension of credit.").

-26-

§ 523(a)(8)(B), the debt must constitute a "qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986." § 523(a)(8)(B).[3]  In turn, IRC § 221(d)(1) provides in relevant part that "[t]he term 'qualified education loan' means any indebtedness incurred by the taxpayer solely to pay qualified higher education expenses."  26 U.S.C. § 221(d)(1) (emphasis added).

In my view, the majority trivializes this statutory restriction; instead of honoring Congress' use of a strict nexus test – signaled by the use of "solely" – it develops its own relatedness test to see if credit extended qualifies as nondischargeable debt.  It exacerbates this error by evaluating its relatedness test as a matter of law, rather than of fact.

My review begins by noting that the RCA is broader than required by the relevant statutes; that is, it picks up expenses other than qualified higher education expenses.  As a result, the indebtedness incurred under it should not fall within IRC § 221(d)(1)'s definition, as such debt is not incurred "solely" to pay qualified higher education expenses."  Even a cursory glance at the RCA confirms this point.  The RCA provides that essentially any "student" who incurs charges, fines and penalties at SOU can and does establish a revolving charge

---

[3] Section 523(a)(8)(B) was added to the Bankruptcy Code in 2005 to extend the nondischargeability of student loans to such loans when made by private, for-profit lenders.  Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 220, 119 Stat. 23, 59 (2005); see also Rafael I. Pardo & Michelle R. Lacey, The Real Student-loan Scandal: Undue Hardship Discharge Litigation, 83 AM. BANKR. L.J. 179, 181 & n.12 (2009).

account.  RCA at ¶¶ 1-2.  The RCA also defines the term "student" very broadly, to include: "[a]ny person who is currently or has in the past been enrolled at [SOU]."  Id. at ¶ 9 (emphasis supplied).

The RCA is also overbroad in a further, fatal, way.  It provides: "As a student, any credit extended to you is an educational benefit or loan."  Id. at ¶ 1.  But saying an extension of credit is a educational benefit or an education loan doesn't make it so.[4]  Campbell's student loan invoices covered not only room and board, but parking tickets, library fines, health insurance charges, medical care, "social fees," printing fees, copying fees, Jazzercise courses,[5] student conduct fines, and fees to cover the cost of replacing several laundry and meal cards.  In short, SOU maintained a revolving credit account for Campbell.

In creating this revolving type of credit, the RCA covers far more debt than is included in IRC § 221(d)(1)'s definition of "qualified educational loan."  Such arrangements are not uncommon, and are called "mixed use loans."  The relevance of that classification here is that such mixed use loans do not

---

[4] Much like the colloquy often posed by Abraham Lincoln; he would relate a story about a "boy who, when asked how many legs his calf would have if he called its tail a leg, replied, 'Five,' to which the prompt response was made that calling the tail a leg would not make it a leg." REMINISCENCES OF ABRAHAM LINCOLN BY DISTINGUISHED MEN OF HIS TIME 242 (Allen Thorndike Rice, ed., new and rev. ed. 1909), available at http://quod.lib.umich.edu/l/lincoln2/BCC9571.0001.001/262?rgn=full+text;view=image.

[5] At least, that's what I think they are.  The invoice entry merely reads "PE Jazz."

-28-

meet the requirements to be a "qualified educational loan." Treas. Reg. § 1.221-1(e)(4) (Ex. 6) (2004); id. § 1.221-2(f) (Ex. 6). See also 69 Fed. Reg. 25489, 25491 (May 7, 2004); T.D. 9125, 2004-1 C.B. 1012 (2004). The reason that such loans cannot qualify is that if the loan is for a "mixed" use, its proceeds cannot be used "solely" for educational purposes. As a consequence, any debt incurred under such a loan is dischargeable.

As one treatise explains:

Mixed use loans aren't qualified education loans.

**Illustration** Student signs a promissory note for a loan secured by student's personal residence. Part of the loan proceeds will be used to pay for certain improvements to student's residence and part of the loan proceeds will be used to pay qualified higher education expenses of student's spouse. Since the loan isn't incurred by student solely to pay qualified higher education expenses, the loan isn't a qualified education loan.

Similarly, revolving lines of credit generally aren't qualified education loans, unless the borrower uses the line of credit solely to pay qualifying education expenses. Such revolving lines of credit include, for example, credit card debt and a university's in-house deferred payment plan which is a revolving credit account that can include a variety of expenditures in addition to qualified higher education expenses.

34 AM. JUR. 2D, Fed. Taxation, at ¶ 18410 (2012) (footnotes omitted and emphasis added) (citing Treas. Reg. § 1.221-1(e)(4), Ex (6)).

Defendants cannot seriously contend that Campbell used the RCA solely to pay "qualified education expenses." Nor can they seriously contend that the scope of the RCA was restricted "solely" to qualified educational expenses. While the Internal Revenue Code defines "qualified education expenses" broadly, see

-29-

26 U.S.C. § 221(d)(2) and 20 U.S.C. § 1087ll, it would defy credulity for Defendants to claim that, for example, Campbell's parking fines or her medical expenses or her Jazzercise classes were a "cost of attendance" under 20 U.S.C. § 1087ll, or otherwise were a "qualified education expense" under § 221(d)(2).

The majority explains this difference away by sweeping these unrelated expenses into the category of miscellaneous expenses related to the cost of allowable "miscellaneous personal expenses."  In this regard, the majority seems to substitute a requirement that the expenses merely be related for the statutory requirement that such expenses be incurred "solely" for educational purposes.  Opinion at 19-20.

The simple response is that this is not the statutory test.  But its use raises another problem for this appeal.  The bankruptcy court granted summary judgment, meaning that there were no contested material issues of fact.  But whether medical expenses, Jazzerize classes and parking fines are allowable "miscellaneous personal expenses" seems to be an issue of determining whether Campbell's and the Defendants' actions qualify or satisfy certain legal standards, a classic factual inquiry.  As such, I am doubly perplexed as to how the majority can sustain the summary judgment on appeal.

Under these circumstances, it was error to find that Campbell's debt was nondischargeable under § 523(a)(8)(B).